**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BERNICE FORRESTER, | ) |
| | ) |
| | ) |
| | ) Case #: 1:15-CV-06964 |
| Plaintiff, | ) |
| | ) |
| v. | ) J. Nicholas G. Garaufis |
| | ) |
| CORIZON HEALTH, INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Josh Bernstein
Josh Bernstein P.C.
*Attorneys for Plaintiff*

175 Varick Street
New York, NY 10014

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                                                                    i

NATURE OF THE ACTION                                                                                   1

THE NEW YORK CITY HUMAN RIGHTS LAW                                                     2

    The Long and Storied History of New York City's
    Municipal Civil Rights Law                                                                       2

    The Restoration Act Legislatively Overrules the Practice
    of Holding City Law Claims to Federal Standards                                    3

    State Courts Give Teeth to the Restoration Act                                        4

    The Second Circuit Recognizes the Restoration Act's Legislative Command
    to Hold City Law Claims to an Especially Lenient Standard                     5

STATEMENT OF FACTS                                                                                     6

    Bernice Forrester Receives Numerous Promotions Over
    the Course of Two Decades                                                                     6

    Ms. Forrester is Diagnosed with Diabetes                                               7

    Fazal Yussuff Expresses Anger with Employees
    Taking Protected Medical Leave                                                             7

    Fazal Yussuff Discourages Ms. Forrester Specifically
    From Taking Medical Leave                                                                    8

    Fazal Yussuff Throws a Fit when Ms. Forrester Renews Her Medical Leave     9

    Defendant Denies Ms. Forrester the Resources to Do Her Job               9

    Yussuff Escalates His Campaign Against Ms. Forrester                        10

    Defendant Fires Ms. Forrester Citing the Elimination of Her Position     10

    Defendant Reinstates Ms. Forrester                                                       11

    The Open Secret That Defendant Was
    Looking for Another Way to Get Rid of Ms. Forrester                           12

    Yussuff Conducts an Irregular Review for Ms. Forrester                      12

I

Defendant Singles out Ms. Forrester for Demotion                                                 13

Don Doherty Short Circuits Any Investigation of
Ms. Forrester's Complaints                                                                      14

Defendant Searches For a Way to Get Rid of Ms. Forrester Entirely                                14

McNerney's Immaculate Explanation for Suspending Ms. Forrester                                   15

Defendant's Evolving Explanations for Ms. Forrester's Suspension                                 15

ARGUMENT                                                                                         16

THE RESTORATION ACT OF 2005 FORECLOSES SUMMARY
JUDGMENT IN CASES THAT WERE FORMERLY RIPE FOR
DISMISSAL                                                                                        17

The Restoration Act Prohibits "Partial" Discrimination,
Precluding Summary Judgment for Lack of Pretext                                              18

NYCHRL Plaintiffs Need Not Demonstrate the Falsity of
Defendant's Legitimate Non-Discriminatory Rationale to
Establish Pretext                                                                            19

The Second Circuit Has Recognized the Reduced Burden to
Survive Summary Judgment on NYCHRL Claims                                                    21

The NYCHRL Makes a Mixed-Motive Standard Available to
All Plaintiffs                                                                               23

THERE IS OVERWHELMING EVIDENCE OF
"PARTIAL DISCRIMINATION"                                                                         25

The Causal Chain Between Plaintiff's Disability-Related Attendance
and Her Demotion Precludes Summary Judgment                                                  25

Doherty's Commingling Comments About Plaintiff's Disability
with Adverse Employment Actions Permits the Inference of
Discrimination                                                                               27

Decision-Maker's Open and Notorious Statements that Too Many
Employees were on Medical Leave and that they Intended to Do
Something About it Demonstrates Sufficient Animus to Require a Jury
Trial on This Claim                                                                          30

Defendant's Failure to Investigate Plaintiff's Explicit Complaints
of Discrimination Carries Greater Weight Under the NYCHRL          33

Yussuff's Expressions of Anger and Discomfort Over Plaintiff's
Taking of Leave Permits the Inference of "Partial Discrimination"   35

Defendant's Singling Plaintiff Out of All the NIC Leadership Staff
for Demotion Rather than Parallel Transfer Precludes
Summary Judgment                                                    37

The Totality of the Circumstances Precludes Summary Judgment        38

HOSTILE WORK ENVIRONMENT HARASSMENT                                 39

RETALIATION                                                         42

SUSPENSION                                                          43

TERMINATION                                                         45

DEFENDANT'S ESTOPPEL ARGUMENT DESERVES
SHORT SHRIFT                                                        47

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Albunio v. City of New York*, 16 N.Y.3d 472 (2011)                                             5

*Bennett v. Health Management Systems, Inc.*, 92 A.D.3d 29 (1st Dept. 2011) 17-20, 25, 38

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129 (2d Cir. 2000)                                   16

*Cid v. ASA Institute of Business & Computer Technology, Inc.*, No. 12-CV-2947,
2013 WL 1193056  (E.D.N.Y. 2013)                                                                 35

*Collins v. Cohen Pontani Lieberman &* Pavane, No. 04 CV 8983,
2008 WL 2971668  (S.D.N.Y. 2008)                                                                 34

*Donnelly v. Greenburgh Cent. School Dist. No. 7*, 691 F.3d 134 (2d Cir. 2012)       26, 32

*Drew v. Quest Diagnostics*, No. 10-CV-00907,
2012 WL 2341690 (S.D.Ohio 2012)                                                                 29

*E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d 816 (S.D.N.Y. 2013)                          23-4, 40

*Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*
252 F.3d 545 (2d Cir. 2001)                                                                      42

*Hasper v. County of Suffolk*, No. 11 CV 3227,
2015 WL 806706 (E.D.N.Y. 2015)                                                                   34

*Hayut v. State University of New York,* 352 F.3d 733 (2d Cir. 2003)                             16

*Henderson v. Montefiore Medical Center,* No. 12 CV 1468,
2013 WL 1155421  (S.D.N.Y. 2013)                                                             28, 34, 44

*Hernandez v. Kaisman*, 103 A.D.3d 106 (1st Dept. 2012)                                          41

*Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir. 2000)                                       42

*Hudson v. Merrill Lynch & Co., Inc.*, 138 A.D.3d 511 (1st Dept. 2016)                           50

*Ibok v. Securities Industry Automation Corp.*, 369 Fed.Appx. 210 (2d Cir. 2010)        38

*Jacobsen v. New York City Health and Hospitals Corp.*, 22 N.Y.3d 824 (2014)         27, 35

*Jordan v. Bates Advertising Holdings, Inc.*, 292 A.D.2d 205 (1st Dept. 2002)                   49

*Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP*, 120 A.D.3d 18 (1st Dept. 2014)        49

*Kimes v. University of Scranton*, 126 F.supp.3d 477 (M.D.Penn. 2015)        36, 40

*Kircsch v. Fleet Street, Ltd.*, 148 F.3d 149 (2d Cir. 1998)        29

*Loeffler v. Staten Island University Hosp.*, 582 F.3d 268 (2d Cir. 2009)        5

*Makowski v. SmithAmundsen,* 662 F.3d 818 (7th Cir. 2011)        43

*McBride v. BIC Consumer Products Mfg. Co. Inc.*, 583 F.3d 92 (2d Cir. 2009)        35

*Melman v. Montefiore Medical Center*, 98 A.D.3d 107 (1st Dept. 2012)        19

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*,
715 F.3d 102 (2d Cir. 2013)        6, 21, 38, 42

*Nyack v. Southern Conn. State* University, 424 F.Supp.2d 370 (D.Conn. 2006)        9

*Ostrowski v. Atlantic Mutual Insurance Companies,* 968 F.2d 171 (2d Cir. 1992)        32

*Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343 (1999)        49

*Phillips v. City of New York*, 66 A.D.3d 170 (1st Dept. 2009)        27

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998)        30

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)        20

*Rivera v. Crowell Moring L.L.P.*, No. 14-cv-2774,
2016 WL 796843, (S.D.N.Y. 2016)        25

*Roberts v. New York State Dept. of Correctional Services*,
63 F.Supp.2d 272 (W.D.N.Y. 1999)        18

*Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881 (2013)        27, 44

*Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*,
116 A.D.3d 134 (1st Dept. 2014)        49

*Smith v. Pilgrim Power Elec. Contracting LLC,* No. 09 Civ. 6130,
2011 WL 3962576 (S.D.N.Y. 2011)        32

*Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2010)        37

*Stern v. Trustees of Columbia University in City of New York*,

131 F.3d 305 (2d Cir. 1997)    45

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981)    18

*Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111 (2d Cir. 2007)    28

*Travellers International, A.G. v. Trans World Airlines Inc.*, 41 F.3d 1570
 (2d Cir. 1994)    40

*Velazco v. Columbus Citizens Foundation*, 778 F.3d 409 (2d Cir. 2015)    6, 22, 48

*Williams v. New York City Housing Authority*, 61 A.D.3d 62 (1st Dept. 2009)    4, 39

**STATUTES**

F.R.C.P. 56    16

Local Laws of the City of New York, No. 85 (2005)    3-4

Local Law of the City of New York, No. 35 § 8-130(c) (2016)    23

New York City Administrative Code § 8-101    2

**OTHER MATERIALS**

Remarks at Public Hearing on Local Laws, June 18, 1991, S 420-91    2

A Return to Eyes on the Prize: Litigating Under the Restored New York
City Human Rights Law", 33 Fordham Urb. L.J. 255 (2006), Craig Gurian    3-4

Defendant's motion presents a narrow question: Do the uniquely liberal contours of the New York City Human Rights Law, in conjunction with the additional testimony of a third-party witness Marilyn Silva, require that Plaintiff's city law claims be decided by a jury whereas her parallel federal claims were dismissed on summary judgment in Forrester I? The answer is a resounding yes.

The City Counsel passed the Local Civil Rights Restoration Act in 2005 as an explicit rebuke to the practice of dismissing city law claims on summary judgment. The law is widely recognized as the most plaintiff-friendly civil rights statute in the country.

This is a single-plaintiff disability discrimination case where there is abundant evidence of discriminatory animus, but also, substantial evidence of poor performance. This is precisely the sort of case that fails under federal law, because indirect evidence of discriminatory motive does not in-it-of-itself establish pretext, but must conversely survive summary judgment under the broad contours of the New York City Human Rights Law where Plaintiffs need not make a showing of pretext.

Defendant's motion presents such a rare situation that your Honor's decision will undoubtedly reverberate as precedent: What happens when New York City Human Right Law claims are returned to the federal forum where parallel federal claims were dismissed on summary judgment with jurisdiction declined over the city law claims? In due deference to the legislature's prerogative, Defendant's motion must be denied.

## NATURE OF THE ACTION: DISABILITY DISCRIMINATION, RETALIATION, AND HOSTILE WORK ENVIRONMENT HARASSMENT

Plaintiff Bernice Forrester ("Ms. Forrester") brings this action under the New York City Human Rights Law ("NYCHRL" or "City HRL"), New York City Administrative Code § 8-101 et. seq..

1

## THE NEW YORK CITY HUMAN RIGHTS LAW

### The Long and Storied History of New York City's Municipal Civil Rights Law

New York City first adopted municipal antidiscrimination laws in 1944 under the Mayorship of Fiorella LaGuardia, a decade before *Brown v. Board*, and twenty years before the passage of the federal Civil Rights Act. Over the ensuing decades the City Council continually expanded the law, cementing New York City's standing at the forefront of civil rights law. In establishing the modern Human Rights Law, the City Council found that:

> "In the City of New York, with its great cosmopolitan population, there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences…The council hereby finds and declares that prejudice, intolerance, bigotry, and discrimination and disorder occasioned thereby threaten the rights and proper privileges of its inhabitants and menace the institutions and foundation of a free democratic state." New York City Administrative Code § 8-101.

The New York City Human Rights Law has long been recognized as the strongest and most plaintiff-friendly civil rights law in the country. In signing comprehensive amendments to the law in 1991, Mayor David Dinkins remarked that: "This bill gives us a human rights law that is the most progressive in the nation, and reaffirms New York's traditional leadership role in civil rights." The 1991 Amendments created individual liability for co-worker harassment and established civil penalties, among other expansions. The law was also intended to require courts to interpret city law claims liberally and independently from their federal and state counterparts. Remarks at Public Hearing on Local Laws, June 18, 1991, S 420-91, annexed hereto as Exhibit FF (82).

Unfortunately, courts did not robustly enforce the 1991 Amendments, instead holding city law claims to ever-more restrictive federal standards and engaging in "rote

parallelism". *See* "A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law", 33 Fordham Urb. L.J. 255 (2006), Craig Gurian, P. 120, annexed hereto as Exhibit GG (83)[1]. Accordingly, city law claims were grouped together with federal claims, and frequently dismissed on summary judgment. Id.

### The Restoration Act Legislatively Overrules the Practice of Holding City Law Claims to Federal Standards

In 2005, the City Council set out to end this practice, passing the Local Civil Rights Restoration Act of 2005 as an explicit rebuke to the practice of holding city law claims to restrictive federal standards:

> "The purpose of this local law, which shall be known as the 'Local Civil Rights Restoration Act of 2005,' is to clarify the scope of New York City's Human Rights Law. It is the sense of the Council that New York City's Human Rights Law has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law. In particular, through passage of this local law, the Council seeks to underscore that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes. Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of the New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights law as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise." Local Laws of the City of New York, No. 85 § 1 (2005).

The Restoration Act of 2005 further amended the "construction" section of the law to require that:

> "The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed.". Id. § 8-130.

---

[1] This article is authored by the principal drafter of the Restoration Act of 2005 and is widely cited by courts interpreting the New York City Human Rights Law.

3

The "uniquely broad and remedial purposes" language marked a paradigm shift away from an ordinary civil statutory scheme that balanced the goal of eradicating discrimination against the burden imposed on employers to:

> "a statute that had at its core traditional law enforcement values. These included the belief that deterrence was necessary to maximize compliance, and that deterrence could only be achieved: (a) under a regime that maximized responsibility for discriminatory acts and concurrently minimized the leeway accorded covered entities to evade such responsibility; and (b) where non-compliance was seen to have serious consequences.[2]" 33 Fordham Urb. L.J. 255 (2006), P. 128, Ex. GG (83).

### State Courts Give Teeth to the Restoration Act

The Restoration Act's "uniquely broad and remedial" interpretive canon was first thoroughly explored in the seminal case of *Williams v. New York City Housing Authority*, 61 A.D.3d 62 (1st Dept. 2009), leave to appeal denied, 13 N.Y.3d 702 (2009). The Court held that: "the Restoration Act notified courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its State and federal counterparts, (b) *all* provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes and (c) cases that had failed to respect these differences were being legislatively overruled." Id. 67-8. The Court went on to state that: "In short, the text and legislative history represent a desire that the City HRL 'meld the broadest vision of social justice with the strongest law enforcement deterrent.' Whether or not that desire is wise as a matter of legislative policy, our judicial function is to give force to legislative decisions. As New York's federal and State trial courts are recognizing the need to take account of the Restoration Act, the application of the City HRL as amended by the Restoration Act must become the rule and not the exception." Id. 68-9.

---

[2] Referring to identical language in the 1991 Amendments that were subsequently ignored, ultimately prompting the passage of the Restoration Act of 2005.

In 2011, the Court of Appeals reinforced the binding nature of the Restoration Act. In *Albunio v. City of New York*, 16 N.Y.3d 472 (2011) the Court of Appeals held that: "we must be guided by the Local Civil Rights Restoration Act of 2005 (LCRRA), enacted by the City Council to 'clarify the scope of New York City's Human Rights Law,' which, the council found "has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law'…The application of the LCRRA provision to this case is clear: we must construe Administrative Code § 8-107(7), like other provisions of the City's Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Id. 477-8.

### The Second Circuit Recognizes the Restoration Act's Legislative Command to Hold City Law Claims to an Especially Lenient Standard

In 2009, the Second Circuit recognized that: "the city HRL can no longer be read as co-extensive with federal law". *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268, 277 (2d Cir. 2009). Citing *Williams* and the Restoration Act of 2005, the Second Circuit recognized that NYCHRL claims must now be given '"an independent liberal construction'", and that failure to subject city law claims to a separate, more lenient analysis mandates vacatur. Id. 278.

Over the ensuing years, the Second Circuit has repeatedly reaffirmed that the Restoration Act of 2005 dramatically alters how federal courts must analyze city law claims: "Pursuant to these revisions, courts must analyze NYCHRL claims separately and independently from any federal and state law claims…Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)

(citations omitted). In the recent case of *Velazco v. Columbus Citizens Foundation*, 778 F.3d 409 (2d Cir. 2015) the Second Circuit went so far as to issue a separate per curiam decision strictly to reiterate that courts scrutinizing NYCHRL claims: "are required by the Local Civil Rights Restoration Act of 2005 to analyze those claims under a different standard from that applicable to parallel federal and state law claims." (citation omitted).

## STATEMENT OF FACTS

**Bernice Forrester Receives Numerous Promotions Over the Course of Two Decades[3]**

Plaintiff Bernice Forrester began working on Rikers Island in 1988 as an Administrative Assistant. She was received a number of promotions over the years, ultimately becoming the On-Island Administrator sometime between 2001 and 2005. Forrester Aff. ¶ 2, Ex. 5[4].

Fazal Yusuf ("Yusuf") became Ms. Forrester's direct supervisor in 2004. He transferred Ms. Forrester to the position of Health Services Administrator ("HSA") in 2005 at the same rate of pay as her prior position. Yusuf transferred Ms. Forrester to a new facility, the North Infirmary Command ("NIC"), in 2009. Id. ¶ 3-4.

Rikers Island houses 12,000 inmates. The NIC services the island's sickest patients, and has always generated complaints far in excess of any other infirmary on Rikers Island. Each facility is overseen by a leadership team comprised of the Site Medical Director ("Site MD"), Director of Nursing ("DON"), HSA, and the Mental Health Unit Chief. HSAs are responsible for the administrative operation of the clinics whereas the Site MD, DON, and Mental Health Unit Chief are responsible for the

---

[3] The following statement of facts concerns the time period at issue in this litigation. The organization of facilities on Rikers Island and other aspects of the facts may have changed now that Defendant has lost the Rikers Island contract.

[4] The Affidavit of Plaintiff's counsel, Joshua Bernstein, introduces the Exhibits and is annexed as Exhibit 1 to this Memorandum of Law. Hereinafter Plaintiff will cite solely to the Exhibits themselves.

delivery of healthcare services in their respective units. Venters Dep. 12:2-15:11, Ex. 12;

D. Stat. of Mat. Fact ¶ 43-44; Forrester Aff. ¶ 5-6, Ex. 5; Jones Aff. ¶ 2, Ex. 3.

**Ms. Forrester is Diagnosed with Diabetes**

Ms. Forrester was diagnosed with Diabetes in 2001. She draws blood and tests her

blood sugar levels every morning. In 2005 or 2006, Ms. Forrester began taking Insulin

frequently. She required intermittent leave when morning tests revealed dangerous blood

sugar levels, bringing about a dazed, confused and disoriented state. Forrester Dep. 70:7-

18, Ex. 6; Forrester Aff. ¶ 8-10, Ex. 5.

Prior to August 2008, when Ms. Forrester's morning blood tests revealed

dangerous blood-sugar levels, she would call into operations and state that she would be

late to work because her blood sugar was off. In the Fall of 2008, Ms. Forrester's

condition deteriorated. She applied and was approved for intermittent FMLA leave

beginning in August 2008, in the form of late arrival and flexible hours. Forrester Dep.

78:1-79:18, Ex. 6; Forrester Aff. ¶ 11, Ex. 5.

**Fazal Yusuf Expresses Anger with Employees Taking Protected Medical Leave**

Yusuf openly expressed his feelings that too many employees were on medical

leave, and declared that he was going to form a committee to "review the FMLAs" to

pare down the rolls. He routinely questioned the legitimacy of specific employees' use of

FMLA leave, such as an individual by the name of Frederick Gay. Donahue Dep. 26:14-

28:3, Ex 7; P. Stat. of Mat. Facts ¶ 3-7; Forrester Aff. ¶ 22-23, Ex. 5. Defendant's own

employees and multiple third-party witnesses confirm that Yusuf was preoccupied with

employees taking leave, and that the entire Executive Staff shared his "concerns".

Cintron Dep. 44:21-46:7, Ex 24; Donahue Dep. 26:14-28:3, Ex 7; Jones Aff. ¶ 14-19, Ex.

3; Bosworth Aff. ¶ 2, Ex. 4. Indeed, Yusuf directed Executive Team staff to discipline employees for every instance of calling in late, regardless of the reason why. When staff objected that they could not do so when such individuals called in late for approved medical leave, Yusuf retorted: "write them up anyway". Silva Aff. ¶ 4, Ex. DD (80). Moreover, during the time period at issue in this suit – 2008-2011 – three out of the four HSAs terminated by Defendant were taking medical leave. Yusuf supervised the HSAs and the (sole) head of Materials Management. P. Stat. of Mat. Facts ¶ 9-10.

**Fazal Yusuf Discourages Ms. Forrester Specifically From Taking Medical Leave**

Yusuf repeatedly chastised Ms. Forrester for calling in late because of her Diabetes. Forrester Aff. ¶ 12, Ex. 5. For example, in November 2009 Yusuf wrote to Ms. Forrester:

> "I am concerned about your time and attendance. I am fully aware that you have medical problems that might justify some of this but with the microscope being on NIC and with you being out so frequent makes me very uncomfortable. I would like for you to start getting to work on time and to improve on your time and attendance." Ex. 48. *See Also* Ex. 45, 46, 47.

On March 29, 2011, Yusuf forwarded a number of emails criticizing Ms. Forrester for her attendance to Employee Relation Manager Eileen McNerney ("McNerney") under the subject line "Concerns". Ex. B (52). On April 7, 2011, Yusuf sent a one-line email to McNerney that read: "Bernice called in again FMLA with ETA unknown", and that same day proceeded to email all HSAs: "Be advised that if at any time you are calling in late to the operations department you must let them know your expected arrival time. Calling in late with ETA unknown is not acceptable." Ex. D (54).

On one occasion, Yusuf called Ms. Forrester into a meeting under the ruse of discussing building issues, and then spent the whole time lambasting Ms. Forrester for

her attendance. Forrester Dep. 163:7-164:17, Ex. 6. Yusuf also criticized Ms. Forrester

for taking medical leave by email, telephone, and in person. Ms. Forrester informed

numerous co-workers that Yusuf was harassing her about her leave, including the

Director of Human Resources, Jerome Donahue ("Mr. Donahue"). Id.; Jones Aff. ¶ 14-

22, Ex. 3; Donahue Dep. 32:15-33:16, Ex. 7.

**Fazal Yusuf Throws a Fit when Ms. Forrester Renews Her Medical Leave**

Ms. Forrester received notice that her application for renewal of medical leave

was approved on March 3, 2010. Ex. E (55). Jerome Donahue called Ms. Forrester

shortly thereafter and told her that Yusuf "threw a fit" when he found out Ms. Forrester's

leave had been renewed. Ms. Forrester responded that she was requesting intermittent

leave as a reasonable accommodation to her disability secondary to her renewed FMLA

leave. Forrester Dep. 132:2-139:24, Ex. 6. Ultimately, Ms. Forrester's entitlement to

ongoing leave was confirmed. Donahue Dep. 29:11-31:16, Ex. 7.

Yusuf "accepted" that Ms. Forrester was entitled to continued medical leave.

Donahue Dep. 31:11-16, Ex. 7. But in fact, Yusuf announced he was going to "get rid" of

Ms. Forrester that very summer. Bosworth Aff. ¶ 3, Ex. 4[5].

**Defendant Denies Ms. Forrester the Resources to Do Her Job**

Ms. Forrester repeatedly requested additional staff, resources, and maintenance

throughout her tenure as the HSA of the NIC, making numerous pleas to her superiors for

---

[5] In Forrester I, your Honor questioned the admissibility of Yusuf's statement as relayed in the Bosworth Affidavit because it was communicated through Yusuf's assistant, Benjamin Roman. However, Mr. Roman was Yusuf's secretary at the time of the statement, and a secretary's communication of a superior's intentions concerning the termination of employees to another employee is within the scope of the assistant-superior relationship under FRE 801(2)(2D). *See Nyack v. Southern Conn. State* University, 424 F.Supp.2d 370 (D.Conn. 2006) (subordinate relaying his supervisor's statement constitutes vicarious admission of party-opponent because of agency nature of subordinate-supervisor relationship). We respectfully request that, viewing all evidence in the light most favorable to the nonmoving party, your Honor consider this statement admissible for the purposes of the instant motion.

9

assistance. Her requests were continually ignored. *See* Ex. O (65); Jones Aff. ¶ 4-13, Ex. 3; Forrester Aff. ¶ 19, 27-28, Ex. 5. Yet when Ms. Forrester was ultimately removed from her position, the floodgates opened, and the facility became awash in resources and attention. Jones Aff. ¶ 6, 13, Ex. 3.

**Yusuf Escalates His Campaign Against Ms. Forrester**

Over the following months, Yusuf frequently expressed his "concern" with Ms. Forrester's "inconsistent schedule". *See e.g.* Ex. 49; Jones Aff. ¶ 20-22, Ex. 3. Yusuf's harassment became so unbearable that Ms. Forrester sent Yusuf's criticisms, and her draft responses to them to Jerome Donahue, and emailed Mr. Donahue the anti-retaliation provision of the FMLA. Ex. F (56) & G (57). During this time period, Ms. Forrester explicitly complained to Mr. Donahue that Yusuf was harassing her for taking medical leave, and eventually told him that she wanted to make a formal complaint. Jones Aff. ¶ 28-31, Ex. 3; Forrester Dep. 232:13-233:3, Ex. 6; Donahue Dep. 32:15-33:16, Ex. 7. There is no evidence that Ms. Forrester's complaints were ever investigated.

After Yusuf "threw a fit" over Ms. Forrester's leave renewal, he began treating Ms. Forrester in a brutish fashion, routinely reducing Ms. Forrester to tears. Ms. Forrester was so traumatized by Mr. Yusuf's abuse that it was affecting her physical health, and her co-worker Patricia Jones described Ms. Forrester as a "battered woman". Jones Aff. ¶ 20-27, Ex. 3; Forrester Aff. ¶ 24, Ex. 5.

**Defendant Fires Ms. Forrester Citing the Elimination of Her Position**

In October 2010, HR Director Jerome Donahue told Ms. Forrester that she was being fired because her position had been eliminated. Mr. Donahue hugged Ms. Forrester and told her to "sue these fuckers". Forrester Dep. 247:17-249:9, Ex. 6; Forrester Aff. ¶

29, Ex. 5. Ms. Forrester called Yusuf and questioned why she was fired, asking if she

could "bump" another employee over whom she had seniority, among other questions.

Yusuf responded by rotely repeating "your position is eliminated!" until he was

screaming at Ms. Forrester over the phone. Forrester Dep. 249:10-150:12, Ex. 6.

**Defendant Reinstates Ms. Forrester**

Don Doherty – Defendant' Division Vice President at Rikers Island – has

described Ms. Forrester's termination as part of a plan to combine her position with a

nursing position and turn it into a "clinical" role, and also to eliminate the HSA position

held by Jorge Pedroza, who was also taking medical leave. The New York City

Department of Health and Mental Hygiene learned that Defendant had fired Ms.

Forrester, and was displeased because Defendant had no one set to replace her. Ex. H

(58); Ex. 28; Venters Dep. 36:22-40:24, Ex. 12.

Don Doherty called Ms. Forrester into a meeting the next week to discuss her

termination. As the meeting unfolded, Doherty declared: "Look, you've always taken

care of your family. Why don't you let your family take care of you?" Ms. Forrester

asked Mr. Doherty what he was talking about, and he responded: "Do you ever think

about going on disability?" Ms. Forrester explained that she wanted to continue working,

not go on disability. During this conversation Ms. Forrester told Mr. Doherty that Yusuf

was harassing her for her FMLA leave and disability accommodations. Forrester Dep.

258:21-264:19, Ex. 6. Doherty would ultimately allow Ms. Forrester to return to her old

position. He announced to the Executive Staff that Ms. Forrester would return as HSA of

NIC, but that the role would ultimately be turned into a "clinical" position, and at that

time Ms. Forrester would be transferred into a position appropriate to her title. Ex. I (59).

**The Open Secret That Defendant Was**
**Looking for Another Way to Get Rid of Ms. Forrester**

After Ms. Forrester was reinstated at the city's behest, Defendant's efforts to find

another way to fire Ms. Forrester were the subject of much discussion. "Many, many

people" told New York City Department of Correction ("DOC") Associate

Commissioner for Health Affairs and Nutritional Services Eric Berliner ("Mr. Berliner")

that Defendant were looking for a reason to fire Ms. Forrester. Berliner Dep. 43:7-44:20,

Ex. 13**.** Indeed, DOH Assistant Commissioner for Correctional Health Services Dr.

Homer Venters ("Dr. Venters") himself suspected that Defendant was looking for an

excuse to fire Ms. Forrester. Venters Dep. 79:18-80:4, Ex. 12.

**Yusuf Conducts an Irregular Review for Ms. Forrester**

Ms. Forrester had an unbroken string of positive performance reviews during her

20+ years on Rikers Island, until she received her review for the calendar year 2010 (in

March 2011). Her score precipitously dropped from a 2.94 in 2008 and 2.67 in 2009 (out

of 4), to a 1.12 in 2010. Forrester Aff. ¶ 35, Ex. 5; D. Stat. of Mat. Facts ¶ 111, 128.

Jorge Pedroza, the only other HSA on FMLA leave at this time, also received a

terrible review, his score dropping from a 3 for 2008 and a 2.67 for 2009 to a 1.82 for

2010. Mr. Pedroza wrote "Please take a second look at my attendance and FMLA" on his

2010 review. *See* Ex. 27. Coincidentally, Mr. Pedroza was the other HSA Defendant

sought to eliminate in the Fall of 2010, and was fired on March 24, 2011. *See* Ex. 28.

Never before had reviews been conducted by anyone other than the HSAs' direct

supervisor, Yusuf. Now five other staff members were conducting the review. All but one

had little to no interaction with Ms. Forrester, and no basis to review her performance.

One of the reviewers selected by Yusuf, Andrea Harris, refused to fill out the vast

majority of the form for that very reason. Yusuf knew these reviewers felt they had no basis to review Ms. Forrester, but Ms. Harris was the only one to explicitly speak up. Forrester Aff. ¶ 37, Ex. 5; Yusuf Dep. 154:25-156:21, Ex. 9.

Despite Defendant's contention that Ms. Forrester's reviews were conducted independently, four repeat the generic mantra that Ms. Forrester lacks leadership skills, in nearly identical language. Fazal Yusuf's review states that Ms. Forrester "lacks leadership skills", Betty McCorvey's review states that Ms. Forrester is "lacking in leadership skills", Jay Cowan's review states Ms. Forrester "Needs to improve leadership skills", and Carlos Castellanos's review states Ms. Forrester has a "lack of man[agerial] skills". *See* Ex. 25; P. Resp. to D. Stat. of Mat. Facts ¶ 121. Moreover, only the HSAs and Mr. Donahue were subjected to these group reviews, Yusuf Dep. 152:1-153:18, Ex. 9. It appears the practice reverted to a single review by Mr. Yusuf the following year.

**Defendant Singles out Ms. Forrester for Demotion**

During the spring of 2011, the NIC had a number of serious problems primarily concerning medical care provided to inmates by the nursing and medical staff. Ms. Forrester attempted to redress the outstanding issues as best she could, but Yusuf denied her numerous requests for additional resources and staffing, only to rain down resources like mana from heaven on Ms. Forrester's successor. Venters Dep. 14:1-23, Ex. 12; Forrester Aff. ¶ 33, Ex. 5; Jones Aff. ¶ 4-13, Ex. 3.

The New York City Department of Health and Mental Hygiene, who have always considered the NIC the most problematic infirmary on Rikers Island, requested that Defendant replace the entire leadership staff of the NIC, comprised of the Site MD, DON, and HSA. Venters Dep. 12:11- 13:25; 42:16-43:11, Ex. 12.

Defendant allocated additional nursing support to the DON, and provided the Site MD with an assistant, but summarily demoted Ms. Forrester. Defendant would later transfer the Site MD and DON into parallel positions at other infirmaries on Rikers Island: only Ms. Forrester was demoted despite Mr. Doherty's promise to transfer her into a position appropriate to her title. Doherty Dep. 126:22-127:25, Ex. 8; Ex. 29; Jones Aff. ¶ 42, Ex. 3; Venters Dep. 45:3-46:18, Ex. 12. Don Doherty again suggested to Ms. Forrester that she retire and go on disability when he gave her the ultimatum of a modest severance or demotion. Forrester Dep. 327:17-331:17, Ex. 6.

**Don Doherty Short Circuits Any Investigation of Ms. Forrester's Complaints**

Ms. Forrester accepted the demotion effective May 9, 2011, and sent a letter to the HR Director Donahue and Don Doherty alleging that her demotion was discriminatory. Mr. Doherty told the Donahue that he would "handle it". Instead, Mr. Doherty simply wrote Ms. Forrester a letter describing the rationale for her demotion, and conducted no investigation whatsoever. Ex. M (63); Donahue Dep. 48:2-21, Ex. 7.

**Defendant Searches For a Way to Get Rid of Ms. Forrester Entirely**

On September 12, 2011, Eileen McNerney bizarrely interrogated Ms. Forrester about what kind of accommodation she required, when it was the same flexible schedule for late arrival she always had. Ex. P (66). McNerney forwarded this correspondence to Don Doherty, who responded three days later by stating he would send Ms. Forrester in for a "medical eval." Ex. 16. Mr. Doherty testified that this "medical eval." was Defendant' right to get a second opinion as to whether Ms. Forrester was able to perform the duties of her job at all. Doherty Dep. 192:15-18, Ex. 8.

14

**McNerney's Immaculate Explanation for Suspending Ms. Forrester**

Ms. Forrester's medical evaluation never occurred because McNerney suspended her five days later. McNerney told Ms. Forrester to pack her things and leave, and refused to give Ms. Forrester an explanation of why she was being suspended. Ex. 33. There is literally zero paper trail of what lead to Ms. Forrester's suspension.

Ms. McNerney claims that during a random audit of employee email accounts to make sure employees were not putting confidential HIPAA information in the subject lines of emails, she stumbled across Ms. Forrester emailing herself documents that did not, in fact, contain confidential HIPAA information in the subject line, but instead contained the location of inmates in administrative segregation that medical staff used to conduct rounds. D. Stat. of Mat. Facts ¶ 199-209. Jerome Donahue, the Director of Human Resources and McNerney's direct supervisor, testified that he was intentionally kept out of the loop of this purported email review dragnet, and didn't even learn about it until after Ms. Forrester was terminated. Donahue Dep. 55:20-59:18, Ex. 7.

**Defendant's Evolving Explanations for Ms. Forrester's Suspension**

Defendant denied Ms. Forrester's repeated requests for an explanation of why she had been suspended. Defendant claim they viewed Ms. Forrester allegedly emailing herself the documents at issue as a massive security breach from the outset, but the documents suggest their initial rationale was a HIPAA violation. Ex. Q (67); Ex. R (68).

After Ms. Forrester's repeated requests for an explanation for her suspension, Defendant called her in for an interview. Don Doherty and McNerney questioned Ms. Forrester for hours. Ms. Forrester stated that she would have no reason to email the documents at issue to herself save that she was frantically trying to send them to her

15

supervisor that day, and could have sent them to herself in error. Ms. Forrester firmly

stated that she could not recall sending these emails. Forrester Aff. ¶ 63-79, Ex. 5**.**

Many weeks later, Defendant finally informed DOC of Ms. Forrester's alleged

breach. The Department of Correction suspended Ms. Forrester's security credentials, but

explicitly left the determination of what disciplinary action – if any – to take against Ms.

Forrester to the Defendant. Ex. U (71). Defendant repeatedly sought clarification of

whether Ms. Forrester's security credentials were merely suspended – which meant they

could be reinstated at Defendant' request – or revoked entirely. Ex. V (72); Berliner Dep.

35:5-12, Ex. 13. The Department of Correction confirmed that it was suspending rather

than terminating Ms. Forrester's security credentials, but Defendant fired her anyway.

Berliner Dep. 39:8-40:14, Ex. 13. Ms. Forrester submitted an EEOC charge, which

Defendant admits they received on October 19, 2011, eight days before she was

terminated. D. Stat. of Mat. Facts. ¶ 277; Ex. W (73).

## ARGUMENT

A party is entitled to summary judgment when it can demonstrate that "there is no

genuine issue as to any material fact". F.R.C.P. 56(a).  In determining whether there is a

genuine issue of fact courts are: "required to view the evidence in the light most

favorable to the party opposing summary judgment, to draw all reasonable inferences in

favor of that party, and to eschew credibility assessments." *Hayut v. State University of*

*New York,* 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted). In employment

discrimination matters, where intent and state of mind are in dispute, "summary judgment

is ordinarily inappropriate." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.

2000).

### THE RESTORATION ACT OF 2005 FORECLOSES SUMMARY JUDGMENT IN CASES THAT WERE FORMERLY RIPE FOR DISMISSAL

As explained at length above, the Restoration Act of 2005 mandates an independent analysis construed broadly in favor of discrimination plaintiffs. This command applies most emphatically to the grant of summary judgment.

In 2011, the First Department held that the Restoration Act is an explicit rebuke to the practice of dismissing NYCHRL claims on summary judgment:

> "We recognize that there has been a growing emphasis on using summary judgment in discrimination cases to promote 'judicial efficiency'. But at least in the context of the City HRL, the Restoration Act provides a clear and unambiguous answer: a central purpose of the legislation was to resist efforts to ratchet down or devalue the means by which those intended to be protected by the City HRL could be most strongly protected. These concerns warrant the strongest possible safeguards against depriving an alleged victim of discrimination of a full and fair hearing before a jury of her peers by means of summary judgment." *Bennett v. Health Management Systems, Inc.*, 92 A.D.3d 29, 43-44 (1st Dept. 2011), leave to appeal denied, 18 N.Y.3d 811 (2012).

The *Bennett* Court made clear that it was not merely commenting on the state of the law post-Restoration Act, but specifically articulating a new standard for summary judgment on NYCHRL claims. Id. 30 ("This appeal gives us the opportunity to address the evidentiary showing required at the summary judgment stage in a discrimination case brought pursuant to the New York City Human Rights Law").

The *Bennett* Court went on to hold that, like all other aspects of the law, the independent liberal construction canon of the Restoration Act reduces the modicum of evidence a NYCHRL plaintiff must present to survive summary judgment: "In any event, for us to create an exemption from the sweep of the Restoration Act for the most basic provision of the City HRL-that it is unlawful 'to discriminate'-would impermissible invade the legislative province. And walling off from examination the doctrines that are

appropriate to shape the presentation and evaluation of evidence that 'discrimination' has occurred would create just such an exemption." Id. 34-5.

### The Restoration Act Prohibits "Partial" Discrimination, Precluding Summary Judgment for Lack of Pretext

Under the Americans with Disabilities Act, plaintiffs must follow the familiar *McDonnell Douglas* burden-shifting framework. A prima facie case is established by showing: (1) the employer is subject to the ADA; (2) plaintiff suffers from a disability; (3) plaintiff can perform the essential functions of her job; (4) plaintiff suffered an adverse employment action under circumstances giving rise to the inference of discrimination. *See e.g. Roberts v. New York State Dept. of Correctional Services*, 63 F.Supp.2d 272, 285 (W.D.N.Y. 1999). Defendant does not contest that Plaintiff fulfills the prima facie case on this motion, and your Honor held that Plaintiff fulfilled her prima facie case in Forrester I according to the more onerous federal standards.

The burden then shifts to Defendant to set forth a legitimate, non-discriminatory explanation for the challenged conduct, which in turn shifts the burden back to the plaintiff to show sufficient evidence for the finder of fact to infer that the articulated explanation is really a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-3 (1981). In Forrester I, your Honor ruled that it was at the final pretext stage that Plaintiff's claims failed.

Under the NYCHRL, however, the framework is quite different. Post-Restoration Act plaintiffs need not set out to prove that Defendant's articulated explanation is a pretext, and that discrimination was the "real reason" for the challenged conduct, but only bear the lesser burden of setting forth evidence that discrimination was one of many reasons for the actions at bar:

"First, it is essential to remember that the *McDonnell Douglas* evidentiary framework is not the only evidentiary framework applicable to discrimination cases. It is not uncommon for covered entities to have multiple or mixed motives for their action, and the City HRL proscribes such 'partial' discrimination since 'under Administrative Code § 8-101, discrimination shall play no role in decisions relating to employment, housing or public accommodations'…

A Plaintiff's response to a defendant's showing of non-discriminatory reasons for its actions can take a variety of forms. In some cases, the plaintiff may present evidence of pretext and independent evidence of the existence of an improper discriminatory motive. In other cases, *the plaintiff may leave unchallenged one or more of the defendant's proffered reasons for its actions, and may instead seek only to show that discrimination was just one of the motivations for the conduct.* In addition, evidence of an unlawful motive in the mixed motive context need not be direct, but can be circumstantial-as with proof of any other fact." *Bennett,* 92 A.D.3d 29, 40-41 (emphasis added) (citations omitted).

*See also Melman v. Montefiore Medical Center*, 98 A.D.3d 107, 127 (1st Dept 2012) ("If a plaintiff can prevail on a 'mixed motive' theory, it follows that he or she need not prove that the reason proffered by the employer for the challenged action was actually false or entirely irrelevant…under the NYCHRL, a plaintiff may prevail on a mixed-motive theory, and that, under such a theory, he or she need not raise an issue as to the falsity or irrelevance of the reason the employer proffers for the challenged action") (citations omitted). *Bennett* makes explicit that NYCHRL claims are viable even where the plaintiff cannot provide sufficient evidence of pretext to satisfy the *McDonnell Douglas* framework. *Bennett*, 92 A.D.3d at 41.

### NYCHRL Plaintiffs Need Not Demonstrate the Falsity of Defendant's Legitimate Non-Discriminatory Rationale to Establish Pretext

As explained above, NYCHRL Plaintiffs need not establish pretext or avail themselves of the *McDonnell Douglas* burden-shifting framework at all. However, a defendant seeking summary judgment bears the burden of establishing both that a plaintiff's claim is not viable under the "partial discrimination" method, and, according to

19

the more traditional *McDonnell Douglas* framework. Id. At the final step of the *McDonnell Douglas* burden-shifting process, both the quantity and kind of evidence of pretext a plaintiff must set forth to survive summary judgment is substantially reduced.

Under federal law, in order to establish that a defendant's legitimate, non-discriminatory explanation for the conduct at issue is a pretext for discrimination, a plaintiff must establish that the articulated reason is false or irrelevant. *See e.g. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). However, under the post-Restoration Act NYCHRL, a plaintiff need only set forth: "some evidence that *at least one* of the reasons proffered by defendant is false, *misleading*, or *incomplete*." *Bennett*, 92 A.D.3d at 43 (emphasis added).

In discussing the Supreme Court's pretext ruling in *Reeves*, the *Bennett* panel held that: "Whatever the merits of the Supreme Court's decision as a matter of federal law may or may not be, *Reeves* did not sufficiently consider the factors crucial to interpreting the City HRL in a way that is 'uniquely broad and remedial.' These factors include: (a) the traditional power to be accorded to the inference of wrongdoing that arises from evidence of consciousness of guilt; (b) the importance of deterring a defendant's proffer of false reasons for its conduct; and (c) the impropriety of a court weighing the strength of evidence in the context of a summary judgment motion." *Bennett*, 92 A.D.3d at 42. The *Bennett* court went on to hold that:

> "It is often the case that the dispute involves not a single, easily isolated incident, but rather an ongoing relationship that has context and nuance. It is difficult enough to discern a defendant's motive or motives in those circumstances without giving it a tactical advantage to throwing numerous non-discriminatory justifications against the wall and seeing which stick. It must thus be the defendant's obligation to articulate its true reasons for acting in the way that it did. And the maximum deterrent effect sought by the City HRL can only be achieved where covered entities understand that, whatever the urge may be to cover up

their actual motivations before arriving in court, there can be no benefit for doing so once in court.

The Supreme Court in *Reeves* was not wrong to state that the strength of a prima facie case can vary. Likewise, the strength of "consciousness of guilt" evidence is not a constant from case to case, and the totality of evidence available to be assessed is case specific. All of these factors are sound reasons why a jury is instructed that it may (not must) infer discrimination when it finds that an employer's explanation of its conduct is unworthy of credence. But the extraordinary remedy of summary judgment presents a different context.

Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to coverup the alleged discriminatory conduct, or an improper discriminatory motive co-existing with other legitimate reasons. These will be jury questions except in the most extreme and unusual circumstances. Proceeding in this way reaffirms the principle that 'trial courts must be especially chary in handing out summary judgment in anti-discrimination cases, because in such cases the employer's intent is ordinarily at issue'". Id. 42-4 (citations omitted).

Under the "maximum deterrent" scheme of the NYCHRL, a plaintiff need only show that

a single one of a defendant's many proffered reasons is "misleading" or "incomplete".

### The Second Circuit Has Recognized the Reduced Burden to Survive Summary Judgment on NYCHRL Claims

In *Mihalik v. Credit Agricole Cheuvreux North America, Inc.,* 715 F.3d 102 (2d

Cir. 2013) the Second Circuit held that insufficient evidence of pretext cannot form the

grounds for granting summary judgment on disparate treatment claims, and that evidence

of poor performance does not doom NYCHRL plaintiffs: "the district court concluded

that Mihalik had not shown that Cheuvreux's proffered reason for her dismissal – her

poor performance - was a pretext for discrimination. Under the NYCHRL, however,

differential treatment may be actionable even if it does not result in an employee's

discharge. Even a poorly-performing employee is entitled to an environment free from

sexual harassment…In other words, even assuming that Mihalik could not prove she was

dismissed for a discriminatory reason or that Cheuvreux has good grounds for discharging her, Mihalik could still recover for any other differential treatment based on her gender." Id. 114 (citations omitted).

In reinstating Mihalik's retaliation cause of action, the Second Circuit made clear that failure to establish pretext is not grounds to dismiss NYCHRL claims involving adverse employment actions: "The district court also granted summary judgment on the alternative ground that Mihalik had not shown that Cheuvreux's non-discriminatory justification for Mihalik's discharge was pretextual. We conclude this was error. As an initial matter, summary judgment is appropriate only if the plaintiff cannot show that retaliation played *any part* in the employer's decision." Id. 116 (emphasis added).

To the extent that there was ever any question whether the indulgent standard in *Bennett* has been subsequently limited, the Second Circuit and the New York City Council have ended the inquiry. In *Velazco v. Columbus Citizens Foundation*, 778 F.3d 409 (2d Cir. 2015) the Second Circuit vacated the District Court's dismissal of the plaintiff's NYCHRL claims without applying the special summary judgment standard of the NYCHRL: "Defendant maintain that the district court effectively applied the NYCHRL standard when in granting summary judgment, it found that the plaintiff's age was not a motivating factor in the decision to terminate him. We do not think the district court spoke with sufficient clarity, however, as to whether the evidence was insufficient to support any causal link between age bias and plaintiff's firing, as required by the NYCHRL", citing *Bennett's* "partial discrimination" theory of discrimination. Id. 411.

This past March, the City Council took the extraordinary step of amending the NYCHRL to ratify three cases that correctly interpreted the broad contours of the city

law, including *Bennett*: "Cases that have correctly understood and analyzed the liberal

construction requirement of subdivision a of this section and that have developed legal

doctrines accordingly that reflect the broad and remedial purposes of this title include

*Albunio v. City of New York*, 16 N.Y.3d 472 (2011), *Bennett v. Health Management

Systems, Inc.*, 92 A.D.3d 29 (1st Dep't 2011), and the majority opinion in *Williams v. New

York City Housing Authority*, 61 A.D.3d 61 (1st Dep't 2009)." Local Law of the City of

New York for the Year 2016 No. 35 § 8-130(c). The City Council, the State Courts, and

the Second Circuit have made abundantly clear that *Bennett's* standard is law.

### The NYCHRL Makes a Mixed-Motive Standard Available to *All* Plaintiffs

Under federal law, a mixed-motive theory is only available where there is direct

evidence of discrimination: "In rare cases, discrimination claims are subject to a mixed-

motive standard of analysis under *Price Waterhouse*. This dual-motive framework is

available where the plaintiff demonstrates the availability of direct evidence of

discrimination." *E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d 816, 833-4 (S.D.N.Y. 2013).

Conversely, a NYCHRL plaintiff need not put forth direct or smoking gun

evidence of discrimination to avail itself of a mixed-motive theory of liability:

> "In the end, though, what remains clear is that the NYCHRL has 'simplified the
> discrimination inquiry; the plaintiff need only show that her employer treated her
> less well [than other similarly situated employees], at least in part for
> discriminatory reasons. The employer may present evidence of its legitimate, non-
> discriminatory motives to show the conduct was not caused by discrimination, but
> it is entitled to summary judgment on this basis only if the record established as a
> matter of law that discrimination played *no role* in its actions. This court further
> observes that the *Melman* court seemed to consider the possibility that a plaintiff
> could sustain a showing under a mixed-motive standard by relying principally on
> circumstantial evidence. Given the liberal framework of the NYCHRL, this Court
> will consider circumstantial evidence when conducting its mixed-motive analysis
> of NYCHRL claims." Id. 836-7 (emphasis added);

Judge Preska went on to rely on the mixed-motive theory of liability to deny summary judgment on plaintiff's retaliation claims under the NYCHRL, while dismissing the federal retaliation claims for absence of "smoking gun" evidence. Id. 851; *See also Bennett, supra at* 41 ("In addition, evidence of an unlawful motive in the mixed motive context need not be direct, but can be circumstantial-as with proof of any other fact").

This distinction is dispositive as to the instant motion because your Honor, in applying the mixed-motive standard to Plaintiff's federal claims, ruled that Plaintiff could not get past the direct evidence threshold of showing a "smoking gun" or "thick cloud of smoke" to reach the substantive question of whether Plaintiff set forth sufficient evidence that discrimination played *any* role in the challenged conduct. Ex. Y (75), P. 30-33.

To be clear, the NYCHRL's prohibition on "partial discrimination" is not and cannot be identical to a mixed-motive analysis under federal law, as that would violate the legislative command that NYCHRL claims be evaluated pursuant to an independent and liberal analysis in all regards. Since a mixed-motive analysis is available to employment discrimination plaintiffs under federal law (for certain causes of action), NYCHRL claims must be evaluated pursuant to an even more lenient standard. As *Bennett, Williams*, *Mihalik*, and the constellation of authority cited above make clear, the Restoration Act of 2005 requires courts to analyze *all* aspects of NYCHRL claims according to a more lenient standard than federal claims, which must therefore include the substantive modicum of evidence necessary to establish causation for adverse employment claims, not merely the framework according to which they are analyzed. As Judge Katherine Forrest has recently opined in urging the City Council to amend the law, the indulgent standards of the NYCHRL allow even baseless claims to survive summary

judgment. *Rivera v. Crowell Moring L.L.P.*, No. 14-cv-2774, 2016 WL 796843 *17,

(S.D.N.Y. 2016). This case is fare from baseless.

## THERE IS OVERWHELMING EVIDENCE OF "PARTIAL DISCRIMINATION"

**The Causal Chain Between Plaintiff's Disability-Related Attendance
and Her Demotion Precludes Summary Judgment**

As M.J. Bloom ruled in her R & R and your Honor adopted in Forrester I:

"Plaintiff has shown that her disability affected her attendance and, by extension, that her

diabetes contributed in some degree to a low attendance score in her 2010 performance

review." Ex. Z (76), P. 28. However: "other factors contributed to plaintiff's overall score

and demotion, including plaintiff's failure to adequately supervise the NIC. Because

attendance problems related to her disability did not alone cause her demotion, it does not

prove pretext." Id. Your Honor adopted the R & R's rationale that: "'attendance problems

related to [plaintiff's] disability did not alone cause her demotion'" in dismissing

Plaintiff's federal demotion claim in Forrester I. Ex. Y (75), P. 33.

Plaintiff has established that her disability affected her attendance, and that her

disability therefore affected her 2010 performance review. Defendant relied on plaintiff's

2010 performance review in demoting her, conclusively establishing that there is at least

an issue of fact concerning whether plaintiff's disability played "no role" in her

demotion. *See* Ex. M. (63) (wherein Doherty explicitly relied on Plaintiff's 2010

performance review, including abysmal marks for attendance, as the rationale for

demoting her); *Bennett*, 40-41 ("the City HRL proscribes such 'partial' discrimination

since 'under administrative code § 8-101, discrimination shall play *no role* in decisions

relating to employment…'") (emphasis added).

In the similar context of *Donnelly v. Greenburgh Cent. School Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012), the Second Circuit held that: "The negative evaluations [plaintiff] received expressively penalize [plaintiff] for his excessive absences, including those taken – assuming his eligibility – pursuant to the FMLA. That the [defendant] manifestly penalized [plaintiff] for absences that a jury could find were protected by the FMLA provides a sufficient basis to send the question of the District's retaliatory intent to the jury to reach a final determination." The Second Circuit has recognized that establishing a connection between an employee's taking of leave that may be legally protected and negative attendance marks for taking such leave constitutes evidence of causation. While this was insufficient to survive summary judgment in Forrester I because other factors contributed to plaintiff's score and demotion, is sufficient in-it-of-itself to pass muster under the NYCHRL because the existence of other legitimate justifications is irrelevant the "partial discrimination" approach. Likewise, under the diminished pretext showing required when proceeding under the alternative burden-shifting approach, it is "misleading" for Defendant to contend that plaintiff's disability played "no role" in Plaintiff's demotion when it explicitly relied on the 2010 review.

Additionally, the evidence that Plaintiff's disability-related leave affected her 2010 performance review and therefore played some – even if minor – role in her demotion is dispositive under the NYCHRL because of the greater burden the law places on employers to accommodate disabled employees. In addressing the connection between Plaintiff's Diabetes-related leave and her demotion, your Honor ruled that even if the connection was sufficient to establish causation, it was insufficient for Plaintiff's federal claims to survive because: "'[t]he ADA does not require employers to tolerate chronic

absenteeism even when attendance problems are caused by an employee's disability'"[6],

citing *Lewis v. N.Y.C. Police Dep't*, 908 F.Supp.2d 313, 327 (S.D.N.Y. 2013). However,

the Court of Appeals has ruled that under the NYCHRL, no accommodation is per se

unreasonable: "Unlike the State HRL, the City HRL's definition of 'disability' does not

include 'reasonable accommodation' or the ability to perform a job in a reasonable

manner. Rather, the City HRL defines 'disability' solely in terms of impairments."

*Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885 (2013) (citations omitted)

(holding that a request for indefinite leave was per se unreasonable under state law but

not under the NYCHRL); *See also Phillips v. City of New York*, 66 A.D.3d 170, 182 (1st

Dept. 2009). The ADA is even narrower than the state HRL, so the same logic applies.

Moreover, the City HRL flips the burden of establishing the ability to perform the

essential duties of the position even with an accommodation onto the defendant as an

affirmative defense. *Jacobsen v. New York City Health and Hospitals Corp.*, 22 N.Y.3d

824, 835 (2014). Here, Defendant failed to plead that Plaintiff could not satisfy the

essential requisites of her job even with a reasonable accommodation, foreclosing the

affirmative defense. *See* Ex. BB (78); *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d

881, 885 (2013) (failure to plead inability to perform essential job functions even with an

accommodation as an affirmative defense forecloses judgment on that basis). Regardless,

the Court of Appeals has made clear that summary judgment is inappropriate on this basis

because it is an affirmative defense, rather than an element of plaintiff's claim.

**Doherty's Commingling Comments About Plaintiff's Disability with Adverse
Employment Actions Permits the Inference of Discrimination**

When discussing Plaintiff's first termination with her, Doherty stated:

---

[6] As noted on Forrester I and Plaintiff's Response to Defendant's Rule 56 Statement, the number and
degree of absences and tardiness is hotly disputed in this matter, and cannot be cursorily relied on as fact.

"'What is it that you want to do?' He's like 'Look, you've always taken care of your family. Why don't you let your family take care of you?' I was like 'What are you talking about?' He said, 'Do you ever think about going on disability?' And I was like –
Q. Did you raise the word 'disability' or did he first?
A. He did.
Q. You're sure about that?
A. I'm as sure as I can be." Forrester Dep. 263:5-19, Ex. 6.

Doherty again suggested that Ms. Forrester go on disability instead of continuing

to work in the conversation where he demoted Ms. Forrester:

"Then Don says well, Bernice, I know we had this discussion before but did you ever think of going out on disability? Then I said to Don, I don't want to go out on disability…
Q. Your testimony is that Mr. Doherty raised disability as opposed to you raising it first?
A. Yes…..
It really upset me because that was the second time that he raised that to me. The first time I made it clear I didn't want to do that. If I wanted to do that, I would have applied for it."[7] Forrester Dep. 330:14-331:17, Ex. 6.

Doherty made this statement in the very conversation wherein he gave Ms. Forrester the

ultimatum of accepting a demotion or a modest severance. *Henderson v. Montefiore*

*Medical Center,* No. 12 CV 1468, 2013 WL 1155421 *3 (S.D.N.Y. 2013) (fact that the

decision-maker: "met with Plaintiff shortly before she was fired and his notes suggest

that Plaintiff's physical disability was on his mind" was probative of discriminatory

animus), citing *Tomassi v. Insignia Financial Group*, *Inc.*, 478 F.3d 111, 114-116 (2d

---

[7] Your Honor's decision in Forrester I noted that in Doherty's version of this conversation, he claimed that Ms. Forrester first raised the issue of her disability, and that he was merely responding to that comment, making Plaintiff's version of the conversation insufficient to overcome Defendant's legitimate, non-discriminatory explanation for the demotion. Ex. Y (75), P. 36-7. However, opposing counsel explicitly asked Plaintiff whether she raised the subject first or Doherty did, and Plaintiff unequivocally answered that Doherty raised the issue, not her. Plaintiff made clear that it upset her that Doherty suggested for the second time that she go on disability in the demotion conversation, because she had rejected the suggestion when she sought reinstatement over her first firing. Forrester Dep. 330:14-331:17, Ex. 6. Plaintiff has now submitted even further testimony making crystal clear that she did not mention being "ill" prior to Mr. Doherty's comment, and that he is simply lying about what was said in that conversation. Forrester Aff. 2, ¶ 3-4, Ex. CC (79).

Cir. 2007) (decisionmaker's remarks are more probative when made near the time of

termination)*; see also Kircsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162-3 (2d Cir. 1998).

Doherty's comments are on all fours with the comments made in *Henderson,*

*supra,* and *Drew v. Quest Diagnostics*, No. 10-CV-00907, 2012 WL 2341690 (S.D.Ohio

2012). In *Drew,* Judge Spiegel held that a HR representative's comments that the plaintiff

would not be able to give "100%" and that her termination would be a "blessing in

disguise" permitted the inference of animus. Likewise, in *Henderson*, notes indicating

that plaintiff's disability was "on the mind" of the decision-maker during the time period

surrounding her termination was considered evidence of animus.

Surely, suggesting that Plaintiff go on disability instead of continuing to work in

the very conversations relaying adverse employment actions permits the inference that

Plaintiff's disability played more than "no role" in her demotion. This is particularly true

because individuals cannot collect disability benefits unless they are so disabled they are

unable to work, suggesting that Doherty considered Plaintiff so disabled she could not

perform her job in the very conversation wherein he demoted her.

Likewise, we know that Plaintiff's taking of Diabetes-related leave was "on the

mind" of Yusuf during the time period he discussed Plaintiff's demotion with Doherty

because he forwarded a number of his emails criticizing Plaintiff for taking leave to

McNerney on 3/24/2011 under the subject line "concerns", and then told McNerney:

"Bernice called in again FMLA with ETA unknown" while sending an email blast to all

HSAS stating it was unacceptable to call in late with no ETA the same day on 4/7/2011.

Ex. B (52); Ex. D (54). Ms. Forrester was demoted effective 5/9/2011, permitting the

ultimate inference of causation from the tight temporal proximity of Yusuf and Doherty's

statements concerning Plaintiff's taking of leave and disability. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (less than two month gap).

**Decision-Maker's Open and Notorious Statements that Too Many Employees were on Medical Leave and that they Intended to Do Something About it Demonstrates Sufficient Animus to Require a Jury Trial on This Claim**

As your Honor ruled in Forrester I, two third-party witnesses have submitted admissible testimony that Yusuf and Doherty openly announced their belief that too many people were on medical leave and that they intended to do something about it. *See* Ex. Y (75), P. 19-20. Third-Party Pat Jones testified that:

1.      "Towards the end of 2010 and the beginning of 2011, Executive Staff made clear they thought too many employees were on FMLA leave." Ex. 3, ¶ 14.

2.      Fazal Yusuf stated that he: "was going to form a committee to review FMLA applications and people who were on FMLA leave because there were too many employees on FMLA leave and FMLA was being abused." Id. ¶16.

3.      "Also during this same time period – the last six months of 2010 and the first few months of 2011- I attended an Executive Staff meeting where Fazal Yussuf stated that there were too many people on FMLA leave and that people were abusing FMLA leave." Id. ¶ 19.

Third-Party John Bosworth testified that:

1.      "In 2010, I attended a meeting where Don Doherty and Fazal Yussuf were present. Don and Fazal discussed that Rikers Island has more staff on FMLA leave than any other facility, and that they needed to do something to reduce the number of people on FMLA leave." Bosworth Aff. ¶ 2, Ex. 4.

Now, an additional third-party witness, former Deputy Director of Nursing

Marilyn Silva, has stepped forward to provide damning evidence on this subject matter.

Ms. Silva has testified that she can recall at least 12(!) instances of Yusuf and Doherty

announcing that too many employees were on medical leave and they intended to "do

something about it". Silva Aff. ¶ 7-8, Ex. DD (80). Perhaps more importantly, Ms. Silva

has identified a number of specific, damning statements:

1.      "The first time Mr. Yusuf told us to write up anyone who comes in late

regardless of the reason why, I responded: 'You can't do that if they're calling in

late for FMLA'. Mr. Yusuf responded: 'write them up anyway'. Id. ¶ 4.

2.      "I had this same conversation with Mr. Yusuf 2-3 times during 2010 and

2011. Each time I told Mr. Yusuf I could not discipline employees for calling in

late when the reason was their taking of approved medical leave, he explicitly

instructed me to discipline such employees notwithstanding their approved leave.

On one of these occasions when I told Mr. Yusuf I simply could not write an

employee up for calling in late because they were doing so pursuant to approved

medical leave, he responded: 'late is late', and told me to discipline them

anyway." Id. ¶ 5.

3.      "On one occasion, Mr. Yusuf became enraged that a subordinate of mine,

Carol Potts, went out on FMLA leave for some dental work. Mr. Yusuf said:

'Why does she have FMLA if she's having dental work done?' I responded: 'She

applied for FMLA and they looked at her documentation and approved it'. Mr.

Yusuf retorted: 'This is dental work, she can't get FMLA leave for that'. Mr.

Yusuf went on to state that he wanted to form a committee so that people like

Carol would not be getting FMLA leave going forward, and so that only people with 'real reasons' for getting FMLA would be approved for it." Id ¶ 9.

Plaintiff herself testified that:

1.      "During my tenure at the NIC, Mr. Yusuf was preoccupied with employees on FMLA leave. He stated on numerous occasions that he thought too many people were on FMLA leave, and that he was going to form a committee to 'review the FMLAs' to pare down the FMLA rolls." Forrester Aff. ¶ 22, Ex. 5.

2.      "Mr. Yusuf also routinely questioned the legitimacy of specific employees use of FMLA leave, including an individual by the name of Frederick Gay." Id ¶ 23.[8]

Taken together, the above statements – corroborated by three third-party witnesses – permit the inference that Plaintiff's Diabetes-related leave played something more than "no role" in Plaintiff's demotion. *Smith v. Pilgrim Power Elec. Contracting LLC,* No. 09 Civ. 6130, 2011 WL 3962576 *7 (S.D.N.Y. 2011) (criticizing employee for taking time off for medical treatment constitutes evidence of causation); *Donnelly v. Greenburgh Cent. School Dist. No 7*, 691 F.3d 134, 152 (2d Cir. 2012); *Ostrowski v. Atlantic Mutual Insurance Companies,* 968 F.2d 171, 182 (2d Cir. 1992). These

---

[8] Your Honor discounted Plaintiff's testimony on this point in Forrester I, citing to Plaintiff's deposition testimony at P. 163:2-164:20 for the proposition that Plaintiff did not mention this at her deposition, permitting your Honor to disregard the affidavit testimony in its entirety as an impermissible addition contradicting her prior testimony. Ex. Y (75), P. 21. However, a close review of the cited testimony reveals that it addresses a different subject matter. Opposing counsel cited to a paragraph of the complaint alleging that Yusuf criticized Plaintiff for taking leave, and then asked: "Can you tell me what Fazel did – what you were referring to here when you say criticizing *you* for taking leave?" Forrester Dep. 163:7-10 (emphasis added). The question was specifically about Yusuf criticizing *Plaintiff* for taking leave, rather than criticizing other employees for taking leave such as Frederick Gay, or making general comments about too many people being on leave. In light of this evidentiary mix-up, and the fact that Plaintiff's testimony addresses a different subject matter than she was asked about at her deposition, this testimony is admissible.

witnesses identify no less than 16 instances of Yusuf and Doherty openly announcing that too many people were on medical leave and that they intended to do something about it, including explicitly disciplining employees for taking protected leave, and questioning the legitimacy of Plaintiff's taking of continued leave along with two other employees[9].

In Forrester I, your Honor ruled that these comments were insufficient to create the "thick cloud of smoke" necessary to invoke the mixed-motive approach, citing an insufficient connection between these comments and Plaintiff's actual demotion despite that some were "questionable". Ex. Y (75), P. 30-1. However, under the NYCHRL, Plaintiff need not set forth "smoking gun" evidence of discrimination to avail herself of the "partial discrimination" approach. Moreover, an additional third-party witness has stepped forward, raising the total to 16 comments, all in the time period surrounding Plaintiff's demotion in the Spring of 2011.

**Defendant's Failure to Investigate Plaintiff's Explicit Complaints of Discrimination Carries Greater Weight Under the NYCHRL**

On May 6, 2011, Ms. Forrester sent an email to Doherty and Director of Human Resources Jerome Donahue stating that: "I believe I am being demoted into this position due to my record of disability and in direct retaliation of my reasonable accommodation request due to my disability." Doherty told HR Director Donahue that he would "handle it", foreclosing any investigation. Instead, Mr. Doherty simply wrote Ms. Forrester a letter explaining his rationale for the demotion, and denying it had anything to do with

---

[9] It should be noted that Plaintiff's accommodation for her disability was identical to her FMLA leave: intermittent leave on those days when her blood-sugar levels were off. This is why, when Yusuf called into question Plaintiff's entitlement to take FMLA leave for more than one year, Plaintiff explicitly requested intermittent leave as a reasonable accommodation for her disability secondary to her FMLA leave. Forrester Dep. 132:2-139:24, Ex. 6. Ergo, any negative comments about employees taking FMLA leave redounds equally to Plaintiff's disability discrimination claims as evincing a negative attitude about the exact same thing: the inconvenience of employees taking legally-protected medical leave.

Ms. Forrester's disability. Ex. M (63), P. 2; Donahue Dep. 48:2-21, Ex. 7. It is undisputed that neither Doherty, Donahue, nor anybody else ever investigated plaintiff's explicit complaint that her demotion was discriminatory. No witnesses were interviewed, no meetings convened, and no evidence was gathered. Doherty simply fired off a rebuttal letter. This abject failure to conduct any investigation is compounded by the fact that Defendant never investigated Plaintiff's prior complaints of discrimination, both for harassment, and for her initial termination. Forrester Dep. 232:13-233:3, 258:21-264:19, Ex. 6; Donahue Dep. 32:15-33:16, Ex. 7. If it's not the crime, it's the cover-up.

Doherty's decision to dismiss Plaintiff's complaint is clearly contrary to Defendant's anti-discrimination policies: "Any PHS supervisor or manager who receives a report or complaint of discrimination or harassment must report that alleged offense immediately to the Employee Relations Manager or Director of Human Resources…All complaints will be investigated promptly and thoroughly and, if appropriate, corrective action will be taken." Ex. EE (81), P. 2. Indeed, even if Doherty had actually engaged in some sort of investigation, it would still have been in violation of company policy, because employees accused of discrimination are not allowed to investigate their own malfeasance. Donahue Dep. 16:9-14, Ex. 7. *See Hasper v. County of Suffolk*, No. 11 CV 3227, 2015 WL 806706 *8 (E.D.N.Y. 2015) (failure to investigate complaint supports inference of discrimination); *Henderson v. Montefiore Medical Center*, No. 12 CV 1468, 2013 WL 1155421 *4 (S.D.N.Y. 2013) (failure to investigate complaint can be relied on as evidence of causation); *Collins v. Cohen Pontani Lieberman &* Pavane, No. 04 CV 8983, 2008 WL 2971668 * 10 (S.D.N.Y. 2008) (failure to investigate a complaint in

contravention of a company policy that all complaints of discrimination will be investigated constitutes evidence of causation).

While Doherty's response may have been adequate under federal law in light of the evidence of poor performance, a failure to investigate multiple complaints of discrimination under the City HRL entails the opposite result. This is because under the NYCHRL, evidence of legitimate non-discriminatory reasons for the challenged action does not bar claims that proceed under the "partial discrimination" approach.

Further, the maximal deterrent scheme of the Post-Restoration Act NYCHRL dictates such a result. For example, under the NYCHRL (and also the New York State HRL law, not at issue here), an employer's failure to engage in the good-faith interactive process functions as an absolute bar to summary judgment on a reasonable accommodation claim, whereas under the ADA an employer can still be granted summary judgment by demonstrating that no accommodation was possible notwithstanding a failure to engage in the good-faith interactive process. *Jacobsen v. New York City Health and Hospitals Corp.*. 22 N.Y.3d 824, 827, 838 (2014), *cf McBride v. BIC Consumer Products Mfg. Co. Inc.*, 583 F.3d 92, 99-100 (2d Cir. 2009). Likewise, under the NYCHRL, a failure to investigate a complaint of discrimination is sufficient in-it-of-itself to impose aider and abettor liability. *See e.g. Cid v. ASA Institute of Business & Computer Technology, Inc.*, No. 12-CV-2947, 2013 WL 1193056 *6 (E.D.N.Y. 2013).

**Yusuf's Expressions of Anger and Discomfort Over Plaintiff's Taking of Leave Permits the Inference of "Partial Discrimination"**

In Forrester I, your Honor ruled that the statements of Yusuf Plaintiff relied on to establish causation were insufficient to require a jury trial because a number were sent to all HSAs, and others were not necessarily hostile on their face. However, under the more

forgiving contours of the NYCHRL, those of Yusuf's statements that are explicitly adverse to Plaintiff's taking of Diabetes-related leave are themselves sufficient.

In November 2009, Yusuf wrote to Plaintiff that he was "uncomfortable" with Plaintiff's time and attendance despite explicitly acknowledging her time and attendance issues were caused, at least in part, by her "medical issues". Ex. 48. A supervisor explicitly stating that their subordinate's taking of medical leave makes them uncomfortable is incontrovertibly adverse to that employee's disability accommodation. *See Kimes v. University of Scranton*, 126 F.supp.3d 477, 504 (M.D.Penn. 2015) (supervisor's statement that employee's taking of medical leave was "inconsiderate" precluded summary judgment). Likewise, when Yusuf learned Plaintiff had renewed her medical leave in Spring 2010, he "threw a fit". To "throw a fit" is defined as "to express extreme anger"[10], regardless of whether Yusuf merely subsequently questioned Plaintiff's leave or actually revoked it.

Yusuf also called Plaintiff into a meeting under the ruse of discussing facility issues, and then spent the whole time lambasting Plaintiff for her attendance issues. Forrester Dep. 163:7-164:17, Ex. 6. In light of Marilyn Silva's testimony that Yusuf made clear that employees were to be disciplined for lateness and attendance notwithstanding that such lateness or absences were protected medical leave, Yusuf's communications chastising Plaintiff for arriving late etc without reference to her Diabetes-related leave take on a more ominous hue, and can no longer be dismissed as management merely addressing staffing concerns strictly within the confines of the law. *See* Ex. 45-51; Plaintiff's Statement of Material Facts ¶ 12.

---

[10] Merriam-Webster online dictionary entry "throw a fit", available at https://www.merriam-webster.com/dictionary/throw%20a%20fit, last accessed 12/18/2016.

It should noted that Mr. Doherty did not directly supervise Ms. Forrester, and gained any perception of Ms. Forrester's performance he had from Yusuf, Plaintiff's direct supervisor. *See* e.g. Doherty Dep. 175:20-13, Ex. 8; Ex. N (64). Moreover, Mr. Doherty shared Yusuf's concern that too many employees on Rikers Island were on medical leave, and that they needed to do something to reduce the number of people on leave. *See e.g.* Bosworth Aff. ¶ 2, Ex. 4**.** Ms. Forrester's demotion followed Mr. Doherty's conversation with Yusuf concerning her performance, and Mr. Doherty gave equivocal testimony as to whether Ms. Forrester's attendance motivated her demotion. Doherty Dep. 166:3-169:3, Ex. 8. There is at the very least an issue of fact as to whether Yusuf tainted Mr. Doherty's perception of Ms. Forrester's performance, even if Mr. Doherty was the "ultimate" decision-maker. *See Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2010) (validating "Cat's Paw" theory of discrimination).

**Defendant's Singling Plaintiff Out of All the NIC Leadership Staff for Demotion Rather than Parallel Transfer Precludes Summary Judgment**

Defendant relies heavily on the DOH's request that they replace the NIC's *entire leadership staff.* However, the evidence shows that instead of removing the DON and Site MD from the NIC, Defendant gave them assistants and greater resources. When the Site MD and DON were transferred away from the NIC months later, they continued in their role as Site MD and DON respectively at different facilities on Rikers Island; only Ms. Forrester was demoted. Ex. 8 126:22-127:25; Ex. 29; Ex. 3, ¶ 42; Ex. 12, 45:3-46:18.

M.J. Bloom recognized this singling out as relevant evidence of causation in Forrester I, but held that it was insufficient to establish pretext because there were other reasons for Plaintiff's demotion. Ex. Z (76), P. 26. However, those other reasons are tainted by potential animus, because they rely on Plaintiff's poor performance as

enumerated in her performance review, which was itself affected by Plaintiff's Disability-related attendance issues. Likewise, that Plaintiff was the only member of the leadership staff to be demoted demonstrates that Defendant is relying on at least one "misleading" rationale. *Bennett* makes clear that this sort of throw-everything-at-the-wall-and-see-what-sticks approach mandates denial of summary judgment under the NYCHRL. *See Bennett*, 92 A.D.3d at 42-44. Likewise, the other NIC leadership staff need not be similarly-situated to Plaintiff because Plaintiff does not rely on this fact as direct evidence of disparate treatment, but as evidence that Defendant has set forth at least one misleading or incomplete rationale.

Finally, it bears repeating that Ms. Forrester's poor 2010 performance review was her first poor review in over two decades of service on Rikers Island. *See Ibok v. Securities Industry Automation Corp.*, 369 Fed.Appx. 210, 213 (2d Cir. 2010), citing *Treglia v. Town of Manlius,* 313 F.3d 713, 722 (2d Cir. 2002). That Defendant immediately demoted Ms. Forrester instead of giving her a chance at another position when Doherty had already explicitly stated that Plaintiff's reinstatement to HSA of NIC was only temporary and that he would ultimately transfer her into a different position appropriate to her title requires a jury trial on this claim. *See* Ex. I (59).

**The Totality of the Circumstances Precludes Summary Judgment**

Under the NYCHRL, there is a special emphasis on assessing the "totality of the circumstances" when evaluating claims. *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (identifying consideration of the "totality of the circumstances" as one of six principles federal courts must follow when parsing NYCHRL claims). Ergo, even if there is a retort to each piece of evidence above, the

mosaic painted by a demotion relying on poor attendance due at least in part to disability leave, fomented by individuals openly announcing their antipathy towards employees taking medical leave, who mentioned Plaintiff's disability in the very conversation where the adverse employment action took place and then subverted the investigation of a discrimination complaint about that very demotion presents a sufficient picture for the jury to infer the ultimate fact that discrimination played a role.

## HOSTILE WORK ENVIRONMENT HARASSMENT

In Forrester I, your Honor dismissed Plaintiff's ADA hostile work environment claims because they could not meet the "severe or pervasive" standard under federal law. Ex. Y (75), P. 13-22. However, under the NYCHRL, questions of severity and pervasiveness are irrelevant. Instead, a plaintiff need only show sufficient evidence for the fact-finder to infer that she was treated "less well" because of her protected characteristic. *Williams v. New York City Housing Authority*, 61 A.D.3d 62, 78 (1st Dept. 2009), leave to appeal denied, 13 N.Y.3d 702 (2009). The Defendant can then advance an affirmative defense that the alleged conduct was no more than "petty slights or trivial inconveniences". Id. 79-80. The *Williams* court stressed that: "by using the device of an affirmative defense, we recognize that, in general, 'a jury made up of a cross-section of our heterogeneous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation'". Id.

Here, the petty slights and trivial inconveniences affirmative defense is not available to Defendant because despite pleading twenty-one affirmative defenses in its Answer, it did not plead the "petty slights or trivial inconveniences" defense. Ex. BB (78). "The general rule in federal courts is that a failure to plead an affirmative defense

results in a waiver" of that defense. *Travellers International, A.G. v. Trans World Airlines Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994). Defendant's failure to plead the affirmative defense in this matter is compounded by its failure to raise the defense in Forrester I, bringing the total to 4+ years of litigation in which Defendant has had the opportunity to raise the defense, and failed to do so.

Regardless, Plaintiff's NYCHRL hostile work environment claims easily pass muster under the "petty slights or trivial inconveniences" standard. While your Honor was correct in holding in Forrester I that Plaintiff's leave was never technically revoked, when Yusuf learned that Plaintiff would continue taking leave in connection with her diabetes, he "threw a fit". It cannot be disputed that Yusuf's throwing a "fit" was in explicit reaction to learning that Plaintiff would continue to take intermittent leave in connection with her diabetes. Similar expressions of outrage have been considered actionable under the NYCHRL though falling short under federal law. *See e.g. E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d 816, 851 (S.D.N.Y. 2013) ("tirade" at plaintiff actionable under NYCHRL but not federal law); *Kimes v. University of Scranton*, 126 F.supp.3d 477, 504 (M.D.Penn. 2015) (supervisor's statement that employee's taking of medical leave was "inconsiderate" precluded summary judgment).

Likewise, Yusuf told Ms. Forrester that he was "uncomfortable" with her time and attendance while simultaneously acknowledging the connection between her medical issues and her time and attendance. Ex. 48. Yusuf told Ms. Forrester he was "concerned" about her inconsistent arrival time on May 17, 2010, despite that he knew Ms. Forrester was legally entitled to arrive late in connection with her Diabetes because the question of whether she was entitled to continue taking Diabetes-related leave had just been resolved

in her favor that spring. Ex. 49. Yusuf called Ms. Forrester into a meeting under the ruse of discussing facility issues, and then spent the whole time lambasting her about her time and attendance. Forrester Dep. 163:7-164:17, Ex. 6. On April 7, 2011, Yusuf sent a one-line email to McNerney that read: "Bernice called in again FMLA with ETA unknown", and that same day proceeded to email all HSAs declaring that calling in late with ETA unknown is "not acceptable". Ex. D (54).

Moreover, Yusuf's specific conduct towards plaintiff must be read together with Yusuf's more general comments concerning antipathy towards employees' taking of leave, some of which were made in Plaintiff's presence. The new evidence presented on this motion by Marilyn Silva in particular solidifies Plaintiff's hostile work environment allegations because it quantifies the frequency of Yusuf's comments and establishes that Yusuf disciplined employees for coming in late even when he knew their lateness was due to already-approved medical leave. Likewise, Yusuf and Doherty's corroborated preoccupation with employees' use and alleged abuse of protected leave redounds to Ms. Forrester's claims because Defendant accused Ms. Forrester of abusing her leave when she was having car trouble. Ex. P (66), P. 3.

Because the NYCHRL places a special emphasis on considering the "totality of the circumstances", the sum total of Defendant's conduct which can be tied to the taking of medical leave requires a jury trial on this issue. *Hernandez v. Kaisman*, 103 A.D.3d 106, 114-5 (1st Dept. 2012) (finding that "isolated" and "sporadic" comments were insufficient under the New York State Human Rights Law, but taken together raised a question of fact on plaintiff's NYCHRL claim). This is leaving aside the aggregation of facially neutral conduct to Plaintiff's hostile work environment claims, which reduced

Plaintiff to a "battered woman". Jones Aff. ¶ 20-27, Ex. 3; *Howley v. Town of Stratford*,

217 F.3d 141, 155-6 (2d Cir. 2000). Likewise, Plaintiff's allegations that Yusuf harassed

her about her taking of Diabetes-related leave by telephone and in person, while too

conclusory to sustain her hostile work environment claim when viewed in isolation under

federal law, are sufficient under the City law when viewed in the context of the

cumulative testimony concerning Yusuf's antipathy to employees' taking of leave.

## RETALIATION

To prevail on a retaliation claim under the NYCHRL, a plaintiff must show that

she took an action opposing discrimination and that as a result the employer engaged in

conduct that was reasonably likely to deter a person from engaging in such action.

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112 (2d Cir.

2013). There is no requirement that the retaliation be "material" or tangible.

Here, the first oppositional activity was in the summer of 2010, when Plaintiff

told HR Director Donahue: "I can't take it anymore. I'm tired of Fazel harassing me

about my FMLA, my ADA, and it's gotten ridiculous, so I would like to make a formal

complaint." Forrester Dep. 232:20-25, Ex. 6. This was around the same time Plaintiff sent

the FMLA anti-retaliation regulations to Donahue (May 2010). Ex. G (57). Plaintiff's

first termination was in October, 2010, within five months of Plaintiff's complaint.

*Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 555

(2d Cir. 2001) (five month gap sufficient to support a causal connection between the

two). Because retaliation need not be tangible or "material" under the NYCHRL,

Plaintiff's first termination is actionable even though it did not ultimately result in a loss

of income.

Even if Plaintiff had the burden of establishing pretext as to her first termination, she could do so because it pre-dated her poor performance review and the city's criticism of the NIC. Likewise, Defendant did not demote the other two members of the NIC's leadership staff in the Spring of 2011 when the city requested they be removed but instead transferred them to parallel positions at another facility. There is an issue of fact as to why Defendant would summarily terminate Ms. Forrester because it was allegedly changing her position into a clinical role instead of looking for another place for her, given her 20+ years of positive performance and that Defendant demoted instead of fired Ms. Forrester entirely when the NIC issues later came to a head in the Spring of 2011.

Moreover, when HR Director Jerome Donahue informed Plaintiff she was being terminated, he hugged her and told her to "sue these fuckers". Forrester Aff. ¶ 29, Ex. 5. Because the Director of Human Resources is involved in employee terminations and is responsible for ensuring compliance with antidiscrimination laws, Donahue's statement is an admission against interest, precluding summary judgment on this basis alone. *See Makowski v. SmithAmundsen,* 662 F.3d 818, 823-5 (7th Cir. 2011).

### SUSPENSION

In Forrester I, Plaintiff's claims concerning her suspension and termination were considered together. However, under the NYCHRL, conduct which is not tangible or material and/or does not rise to the level of an adverse employment action under federal law is still actionable under the City law if it rises above the level of petty slights or trivial inconveniences, or might discourage a reasonable person from making a complaint, as discussed above. Ergo, Plaintiff's suspension must be considered separately even though Plaintiff was paid until her ultimate termination.

Ms. Forrester and Eileen McNerney had a terse back-and-forth concerning Ms.

Forrester's leave on 9/12/2011, culminating in McNerney stating that "it would constitute

a severe hardship on operations if we could not predict your arrival time within a

reasonable degree of certainty." Ex. P (66). Doherty decided to send Ms. Forrester in for

a "medical eval." in response to McNerney forwarding these communications to him. Ex.

16. Mr. Doherty testified that this "medical eval." was Defendant' right to get a second

opinion as to Ms. Forrester's ability to perform the duties of her job. Doherty Dep.

192:15-18, Ex. 8. The "medical eval" never happened, and Ms. Forrester was instead

suspended five days later. Given Doherty and McNerney's preoccupation with Ms.

Forrester's leave in the week prior to Ms. Forrester's termination, the finder of fact is

permitted to infer that such concerns motivated, in part, Ms. Forrester's suspension.

In Forrester I, your Honor found that such evidence was insufficient to establish

pretext because ADA regulations permit inquiries into the ability of employees to

perform job-related functions. Ex. Y (75), P. 44. However, the NYCHRL permits no such

second-guessing, because it requires the provision of accommodations without regard to

whether such accommodations allow the employee to perform the job in a "reasonable"

manner. *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885 (2013). Moreover,

under the NYCHRL, Plaintiff need not establish pretext. Instead, this is evidence that

Plaintiff's disability was "on the mind" of Doherty in the days before he ordered

Plaintiff's suspension. *See Henderson v. Montefiore Medical Center,* No. 12 CV 1468,

2013 WL 1155421 *3 (S.D.N.Y.2013). Indeed, Doherty was not merely thinking about

Plaintiff's disability five days before Plaintiff was suspended, but actively questioning

whether Ms. Forrester's disability rendered her unable to perform the duties of her job.

Defendant's own IT security policies require that an employee discovering a breach – such as the one McNerney claims to have discovered – immediately report the breach to their immediate supervisor and fill out an incident report. Defendant did neither, nor did they follow any other aspect of the policy at issue. *See* P. Resp. to D. Stat. of Mat. Fact ¶ 222; Ex. 39, P. 18. Given the purported seriousness of the alleged breach, it is mind-boggling that no incident report was ever filled out and that there is zero paper trail of the events leading to Ms. Forrester's suspension. *See Stern v. Trustees of Columbia University in City of New York*, 131 F.3d 305, 313 (2d Cir. 1997) *citing Zahorik v. Cornell University*, 729 F.2d 85, 93 (2d Cir. 1984).

McNerney did not merely fail to inform her direct supervisor, Jerome Donahue, of this alleged breach. Mr. Donahue testified he was *intentionally* kept out of the loop[11]. Donahue Dep. 55:20-59:18, Ex. 7. Moreover, a week after Ms. Forrester was suspended, she wrote an email to Defendant alleging that her suspension was due to her disability. Ex. Q (67). On October 24, 2011, having been suspended for four weeks, she wrote another email to Defendant alleging discrimination and violations of the FMLA. Ex. X (74). There is no evidence that these complaints of discrimination were ever investigated.

## TERMINATION

Taking Defendant at its word, Ms. Forrester's termination was not a fait accompli, but rather came into focus as facts developed after her suspension. However, Doherty's

---

[11] In Forrester I, your Honor held that Defendant's undisputed violation of its own IT Security policies was insufficient evidence to demonstrate pretext because McNerney reported the alleged breach to Doherty, who is higher in the food chain than Donahue, demonstrating that McNerney took the matter *more* seriously than the policy dictates. However, Doherty is the alleged discriminator as to Plaintiff's demotion, and Donahue testified not merely that the policy wasn't followed, but that he was *intentionally* kept out of the loop by his subordinate. Drawing all inferences in favor of the non-moving party under the lenient contours of the NYCHRL, this is sufficient to create an issue of fact. It should also be noted that there is no precedent for the notion that an employer's violation of its own policy is excused if the employer alleges it did something else demonstrating it took the incident even more seriously than policy dictates.

preoccupation with Plaintiff's medical status shortly before Plaintiff's suspension, and Defendant's failure to follow its own IT Security breach policy also redound to Plaintiff's claim as to her termination because they both influenced that outcome.

Defendant argues that the nail in Ms. Forrester's coffin was DOC's suspension of her security credentials. However, as explained in Plaintiff's Statement of Facts, Ms. Forrester's credentials were suspended, not revoked, and could have been reinstated. Likewise, Defendants' security policy states that the consequence of losing one's security credentials is suspension or termination, not automatic termination, and Defendants have continued to employ individuals whose security credentials were suspended. *See* P. Response to D. Stat. of Mat Facts ¶ 27; Statement of Facts P. 15-17. At a bare minimum, Defendant's explanation is "incomplete", requiring a jury determination per *Bennett*. DOC explicitly left what, if any, action to take against Ms. Forrester up to the Defendant. Ex. U (71). If there is no difference between suspension and termination of security credentials as Defendant urges, then why was McNerney seeking clarification on this point before the decision to fire Ms. Forrester was made? *See* Ex. V (72).

Likewise, DOH's remark that Ms. Forrester had ironically given Defendant an excuse to fire her in an attempt to document Defendant's malfeasance permits a jury finding of liability because this comment was made by Dr. Homer Venters, the very same person whose direction to transfer the leadership out of NIC allegedly resulted in Plaintiff's demotion. Ergo, a reasonable person, such as Dr. Venters, could find that animus played a role in Defendant seizing on this rationale for termination. Ex. 36.

To date, 4+ years after McNerney allegedly discovered the emails at issue, Defendant still has put forth no explanation as to why Plaintiff would send these emails

to herself, and appears to concede Plaintiff's explanation that the transmission was accidental. McNerney's alleged "biggest concern" was that Ms. Forrester knew the inmates listed, which was mollified after her interview. To then shift the explanation to an argument that sending the emails across an unsecured server was the cardinal sin smacks of just the sort of shifting-explanations and standing-on-a-technicality that fact-finders routinely reject. Plaintiff respectfully refers your Honor to her response to Defendant's Rule 56 Statement for further factual disputes concerning Plaintiff's suspension and termination.

Finally, the long series of events leading to Ms. Forrester's termination requires a jury determination. If the jury can find that Plaintiff's demotion was motivated, in part, by discrimination, then surely it can find the same motivation by the same decision-maker in Plaintiff's termination. Likewise, a week after Ms. Forrester was suspended, she wrote an email to Defendants alleging that her suspension was due to her disability. Ex. Q (67). On October 24, 2011, having been suspended for four weeks, she wrote another email to Defendants alleging discrimination and violations of the FMLA. Ex. X (74). There is no evidence that these complaints of discrimination were ever investigated or acted upon. Like with the abject lack of investigation of her prior complaints, Defendant's refusal to provide any explanation for Plaintiff's suspension for nearly a month and then failing to investigate her complaints permits the jury to infer a cover-up.

**DEFENDANT'S ESTOPPEL ARGUMENT DESERVES SHORT SHRIFT**

Defendant's collateral estoppel argument is specious. Obviously, there cannot be estoppel based merely on the fact that Plaintiff's federal claims were dismissed. That would amount to an outright judicial repeal of the NYCHRL and the Restoration Act of

2005, raising a constitutional question concerning the separation of powers. The Restoration Act of 2005, as recognized numerous times by the Second Circuit, abolished parallelism, and requires a separate, independent liberal analysis of city law claims. To accept Defendant's argument would create a loophole around the Second Circuit's command. Instead of separately construing city law claims, federal courts could simply dismiss federal claims and decline jurisdiction over pendent city law claims. Then when the city law claims were subsequently brought, simply dismiss them again on the basis of collateral estoppel without every separately parsing the claims.

Nor are Defendant's specific arguments any less specious. Defendant urges that your Honor invoke collateral estoppel because of the ruling in Forrester I that Plaintiff did not show sufficient evidence that discrimination was *a* motivating factor, and therefore your Honor somehow already applied the city law standard despite explicitly not doing so. The Second Circuit has addressed precisely this scenario, holding that a trial judge's determination that there was insufficient evidence to establish that the prohibited characteristic played a motivating role in the challenged conduct under federal law was insufficient to dismiss claims under the City HRL, which requires a separate, more forgiving "motivating factor" inquiry: "Defendant maintains that the district court effectively applied the NYCHRL standard when in granting summary judgment, it found that the plaintiff's age was not a motivating factor in the decision to terminate him. We do not think the district court spoke with sufficient clarity, however, as to whether the evidence was insufficient to support *any* causal link between age bias and plaintiff's firing, as required by the NYCHRL". *Velazco v. Columbus Citizens Foundation*, 778 F.3d 409 (2d Cir. 2015) (emphasis added).

Indeed, if collateral estoppel applies, it operates to preclude Defendant's motion, not justify it. In Forrester I, Defendant moved for summary judgment on Plaintiff's NYCHRL claims, and your Honor declined to grant such judgment. Ergo, it is Defendant who is collaterally estopped from seeking judgment on the same basis here.

As Defendant notes in its motion, collateral estoppel applies only if (1) the "issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action"; and (2) "the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 349 (1999).  As described above, there is no identity of issue as to Plaintiff's adverse employment action claims because the pretext burden is reduced on NYCHRL claims when proceeding according to the burden-shifting framework, and likewise when proceeding under a mixed-motive analysis. The retaliation framework is reduced to a two-step inquiry, and hostile work environment harassment need not be "severe or pervasive", among other differences.

Where appellate courts have examined the trial court's grant of summary judgment for collateral estoppel on the very basis Defendant seeks here, they have roundly rejected the notion that the grant of summary judgment on federal discrimination claims estops NYCHRL claims, reinstating the plaintiff's claims. *Jordan v. Bates Advertising Holdings, Inc.*, 292 A.D.2d 205 (1st Dept. 2002); *Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP*, 120 A.D.3d 18 (1st Dept. 2014). Indeed, Defendant's own authority makes clear that collateral estoppel is only available on discrete factual questions that do not implicate the application of law to facts or the differences between federal and NYCHRL claims. *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan,*

*LLP*, 116 A.D.3d 134, 140 (1st Dept. 2014). A close reading of those slim few cases that have granted summary judgment on the basis of collateral estoppel show that Court nevertheless parses the claims at bar, and only grants summary judgment on the basis of collateral estoppel in eyebrow-raising, meritless litigation, i.e. a claim of discrimination in a reduction of force by Merrill Lynch during the height of the recession. *See Hudson v. Merrill Lynch & Co., Inc.*, 138 A.D.3d 511 (1st Dept. 2016).

      This is far from such a case. Ultimately, the aggregate sum of Plaintiff's evidence requires a jury trial under the permissive guidelines of the post-Restoration Act NYCHRL.


      For the foregoing reasons, Plaintiff Bernice Forrester respectfully requests that your Honor deny Defendant's motion in its entirety.


Dated: December 19, 2016                  Josh Bernstein, P.C.
                                        *Counsel for Plaintiff*

                            By:_____/s/_____
                              Joshua Alexander Bernstein

                                175 Varick Street
                              New York, NY 10014
                              (646) 308-1515
                       jbernstein@jbernsteinpc.com